Filed 7/15/16  In re R.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.G., et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E065222 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J255570-J255573) |
| v. | OPINION |
| R.G., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Kristina M. Robb, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant R.G. (Father) appeals from the juvenile court's order terminating his parental rights as to his four children: nine-year-old Ar.G., six-year-old An.G., five-year-old Rog.G., and two-year-old Roc.G.[1] Father's sole contention on appeal is that the juvenile court erred in failing to find the beneficial parent-child relationship exception to termination of parental rights applied. We reject this contention and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

On July 9, 2014, the San Bernardino County Children and Family Services (CFS) detained the children due to the parents' substance abuse, domestic violence, criminal history, mental health issues, and medical neglect.[2] The children were placed with their maternal grandmother.[3]

---

[1] Neither A.C. (Mother) nor the children's half siblings (14-year-old Al.B. and 13-year-old Am.B.) are parties to this appeal. The alleged father of Al.B. and Am.B. was identified as R.B., and is also not a party to this appeal.

[2] Roc.G. has spina bifida and required medical care. The parents failed to take the child to his medical appointments for approximately six months.

[3] The maternal grandmother resided with the parents and the children. However, the parents moved out of the family home to allow the children to be placed with the maternal grandmother. The maternal grandmother and the children later moved out of the family home, and the parents moved back into the residence. The social worker's reports also mention the maternal grandmother's husband sparingly; collectively, they will be referred to as the maternal grandparents.

On July 11, 2014, CFS filed petitions on behalf of the children pursuant to Welfare and Institutions Code[4] section 300, subdivision (b) (failure to protect). The children were formally detained on July 15, 2014, and the parents were provided with supervised visitation.

The social worker recommended that the allegations in the petitions be found true and that the parents be provided with reunification services. Mother admitted that all of the allegations in the petitions were true. She also admitted to abusing marijuana and methamphetamine, and suffering from a bipolar disorder and mood swings. The maternal grandmother confirmed Mother's statements, and added Mother had a long history of suicide attempts, threats, and ideation.

Father admitted to smoking marijuana and having engaged in acts of domestic violence with Mother. Father had a restraining order against Mother, but both parents had violated the order and intended on staying together in a relationship. Although Father claimed that there were only two incidents of domestic violence between him and Mother, the children reported ongoing episodes of domestic violence between the parents with Father being the aggressor. The children reported feeling safer with the parents out of the home and only desired supervised visitation with the parents.

---

[4] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

The jurisdictional/dispositional hearing was held on August 5, 2014. At that time, both parents submitted on the petitions. The juvenile court sustained the petitions, declared the children dependents of the court, and maintained them with the maternal grandmother. The parents were offered reunification services and supervised visitation.

On November 24, 2014, CFS recommended that the social worker be given the authority to liberalize visits to unsupervised. CFS reported that the parents had made "significant progress in their case plan" and that they had interacted with the children in a positive and loving manner during visits. CFS further noted that the parents appeared to be "bonded" with the children; that the children interacted "lovingly" with the parents; and that the parents were working hard to get the family back together and build a relationship with trust. Based on their progress, the court authorized the parents unsupervised overnight and weekend visits with the children.

By the time of the six-month review hearing in February 2015, CFS recommended additional services for the parents. The parents continued to make progress in their case plan; however, the children expressed concern about fighting between the parents and their sobriety. The children enjoyed visiting their parents once a week unsupervised for four to six hours and the visits had been mostly positive. The children, however, believed their parents had not changed. In addition, the children's two older half siblings refused to visit the parents, stating they were happier with their grandmother and lacked confidence the parents would ever change. The children were all happy and well-adjusted in their maternal grandparents' care.

On March 3, 2015, CFS advised the court that the children had been having overnight and weekend visits since February 4, 2015, and "everything appear[ed] to be going well." The children were "interacting positively with the parents" and "counseling for the older children" had begun to reestablish their trust in the parents. Additionally, the parents continued to test negative for drugs.

On April 23, 2015, pursuant to the parties' mediation agreement, the juvenile court returned the children to the custody of Father and Mother under a family maintenance plan.

Unfortunately, less than six weeks later, on June 5, 2015, CFS detained the children and placed them back in the maternal grandmother's care. CFS also filed supplemental petitions pursuant to section 387 based upon Mother's substance abuse, mental health issues, and taking the children to Mexico on June 2, 2015, without permission. The petition also alleged that Father should have known of Mother's substance abuse and mental health issues and that Father's ability to appropriately care for and parent the children was unknown. Father claimed he was opposed to Mother taking the children to Mexico but " 'could do nothing' " to stop her. The children also reported that the parents had been "drinking regularly" and that Mother had recently been arrested for driving under the influence (DUI).

The children were formally detained on June 10, 2015, and the parents were provided with supervised visitation.

CFS reported the "prognosis for reunification" was "guarded," noting both parents had previously been engaged in reunification services from August 2014 through April 2015. CFS was concerned that Father and Mother were either "unable or unwilling" to benefit from the services they received and that the children continued to report the parents had not changed and were still drinking. CFS nonetheless recommended further reunification for the parents. CFS noted that although Father "stated to not have any knowledge of the [M]other's DUI," he "expressed a great deal of concern" and had asked Mother not to go to Mexico. CFS believed Father was "very supportive," but had remained "passive" "towards the real issues surrounding their sobriety and relationship problems."

On July 1, 2015, the juvenile court found the allegations in the supplemental petition true, removed the children from parental custody, and maintained them in the maternal grandmother's home. The court also provided the parents with reunification services and ordered them to participate. The court authorized unsupervised/overnight visits "when deemed appropriate."

Although the parents had previously visited the children on a regular basis, by the time of the August 5, 2015 status review hearing, the parents had not visited the children since they were detained on June 5, 2015. The children continued to reside with the maternal grandparents and appeared happy and well adjusted. The children's two half

6

siblings continued to express concern over the parents' history of abuse and Mother's mental health, and had verbally desired to remain with the maternal grandparents.

The contested 12-month review hearing was held on August 5, 2015. At that time, the children's counsel asked the court to terminate the parents' services. Counsel noted that despite the parents' participation in services and having received unsupervised visits, the children continually reported the parents were not getting better. Following further argument, the juvenile court terminated the parents' services and set a section 366.26 hearing.

In a section 366.26 report dated December 3, 2015, CFS recommended parental rights be terminated and adoption be selected as the permanent plan. The children remained placed together in the home of the maternal grandparents, who have known the children since birth. The maternal grandparents continued to express their love for the children, desire to adopt them, and provide them with stability. The children were healthy and current on their medical exams. Roc.G. continued to suffer from spina bifida, club feet, and an enlarged heart, and was being medically monitored. The children were developmentally on target and were mentally and emotionally stable.

Since the children were returned to the maternal grandparents' home on June 5, 2015, the parents had "very limited contact with the children." The children expressed apprehension about visiting with the parents, believing they would " 'never change.' " The children recognized Mother and Father would always be their biological parents, but were happy and stable living with the maternal grandparents. When the social worker

7

visited and spoke with the children at the maternal grandparents' home, the social worker observed the children were happy, comfortable, and secure in their home, and looked to the maternal grandparents for support and guidance. The five eldest children indicated they knew what adoption was and stated they wanted the maternal grandparents to adopt them. Although the youngest child, Roc.G., was not of an age to understand adoption, he appeared happy, comfortable and very secure in his grandparents' care. He was also observed to be very attached to them and looked to them for safety and comfort.

The contested section 366.26 hearing began on December 17, 2015. In relevant part, Father testified that the children lived with him and Mother since their birth; that after they were detained, he and Mother visited with the children every weekend for a total of five hours per visit at the maternal grandmother's home; and that he and Mother had visited with the children two times a week since August 2015. During the visits, Father and Mother talked to the children, asked them how they were doing, played with them, took them shopping, and went out to eat. The children were happy to see their parents, would run into their arms and give them kisses and tell them they loved them, and at the end of visits, the children cried. Father also stated that the children called him " 'dad' " and that Ar.G., An.G., and Rog.G. told him and Mother they wanted to come home with them. Father further asserted that the maternal grandmother had allowed him and Mother unsupervised visitation with the children when they went out to eat or shopping, even though he was aware the court had limited him to supervised contact. However, he did not believe he was doing anything wrong. Father was unaware the

8

children "often" did not want to visit with him and did not hear the children complain about seeing him. He believed the children wanted to be with their parents and desired to come home.

The maternal grandmother, in relevant part, testified that for the past month Father had visited the children each week for two to three hours and that she had allowed Father unsupervised visits. The children never appeared to be injured or neglected after the visits and the children never complained about the parents' behavior. Nonetheless, the children frequently told the maternal grandmother that they did not want to return to Father's home, that they wanted to stay in the maternal grandmother's home, and that the parents would never change. The maternal grandmother asserted that she would follow the court's order if the court told her that day not to allow the children to be unsupervised with the parents.

Following the maternal grandmother's testimony, the matter was continued. In addition, the court changed the initial visitation order and provided the parents with supervised visitation to be supervised by a visitation center or CFS.

On January 11, 2016, CFS advised the court that since the prior hearing, the maternal grandmother had complied with the court's order and had not allowed Father unauthorized contact with the children. The children expressed enjoying visits with Father, but stated they did not want to return to their parents' home.

On January 14, 2016, the continued section 366.26 hearing was held. Father's counsel argued that the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(A), was applicable. The children's counsel noted that in speaking with each of the children individually, the children were in agreement with adoption, and that the maternal grandmother had served in the parental role. The juvenile court rejected the beneficial parent-child relationship exception to adoption, found the children adoptable, and terminated parental rights.[5] This appeal followed.

II

DISCUSSION

Father contends the juvenile court erred in finding the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(A), did not apply to preclude the termination of parental rights. We disagree.

This "may be the most unsuccessfully litigated issue in the history of law." (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1255, fn. 5, overruled on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 413-414.) While it can have merit in an appropriate case (e.g., *In re S.B.* (2008) 164 Cal.App.4th 289, 296-301), this is not such a case.

---

[5] In rejecting the beneficial parental relationship exception, the court noted that although the parents had consistently visited with the children, the children had continued to state they are concerned the parents will never change and that they would rather stay with their maternal grandmother. The court further noted that the parents were more akin to friendly visitors than an actual parent providing for the care and needs of the children on a daily basis.

In general, at a section 366.26 hearing, if the juvenile court finds that the child is adoptable, it must terminate parental rights. (§ 366.26, subds. (b)(1), (c)(1).) This rule, however, is subject to a number of statutory exceptions (§ 366.26, subds.(c)(1)(A) & (c)(1)(B)(i)-(vi)), including the beneficial parental relationship exception, which applies when "termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

"When applying the beneficial parent-child relationship exception, the court balances the strength and quality of the parent-child relationship in a tenuous placement against the security and sense of belonging that a stable family would confer on the child. If severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1234-1235.)

" '[F]or the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.' [Citation.]" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938.) " 'A biological parent who has failed to reunify with an adoptable child may not derail adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court

11

should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be *beneficial to some degree*, but that does not meet the child's need for a parent.'  [Citation.]"  (*Id*. at p. 937.)  Even a "loving and happy relationship" with a parent does not necessarily establish the statutory exception.  (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.)  "The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent[-]child bond."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

The parent contesting the termination of parental rights bears the burden of showing both that a beneficial parental relationship exists and that severing that relationship would result in great harm to the child.  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)  A juvenile court's finding that the beneficial parental relationship exception does not apply is reviewed in part under the substantial evidence standard and in part for abuse of discretion.  The factual finding, i.e., whether a beneficial parental relationship exists, is reviewed for substantial evidence, while the court's determination that the relationship does or does not constitute a "compelling reason" (*In re Celine R.* (2003) 31 Cal.4th 45, 53) for finding that termination of parental rights would be detrimental is reviewed for abuse of discretion.  (*In re Bailey J.*, *supra*, at pp. 1314-1315; accord, *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.)  A juvenile court's ruling on whether there is a " 'compelling reason' " is reviewed for abuse of

discretion because the court must "determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and . . . weigh that against the benefit to the child of adoption." (*In re Bailey J.*, *supra*, at p. 1315, italics omitted.)

Although Father had consistently visited the children and the visits were appropriate, he has failed to show that such a strong bond existed that it would be detrimental to the children to terminate parental rights. Father claims that he had maintained a close and bonded relationship with his children through his many years of custody of the children and extensive visitation. He also notes that CFS had indicated the children appeared to be " 'bonded' " with their parents and interacted " 'lovingly' " with the parents during visits. Finally, he argues that he bought the children clothes, took them out to eat; and that the children would greet him with a hug and kiss at the visits, want to leave with him, and cried at the end of the visits. That, however, is not the standard. Rather, the juvenile court must look at whether the children are bonded to the parents; then it must weigh that bond (if any) against the benefit of adoption by the prospective adoptive parents.

There was no evidence that any child would be harmed, much less "greatly harmed," by termination of parental rights. (*In re B.D.*, *supra*, 159 Cal.App.4th at pp. 1234-1235.) The children's primary attachment was with their maternal grandmother. The maternal grandmother had known the children since birth and had resided with the parents and the children until the parents moved out of the family home

to allow the children to be placed there with the maternal grandmother. The children were detained in July 2014, returned to the parents' care in April 2015, and again detained in June 2015 and placed in the maternal grandmother's home. The children had resided solely in the maternal grandmother's care for approximately 17 months from the initial removal to the section 366.26 hearing. Father's three older children were seven, five, and four years old, and the youngest child with medical needs was 12 months old when they were initially removed from parental custody.

As to Father's older three children, it appears they had lived with Father longer than they had lived with the maternal grandmother.[6] Nonetheless, Father was, at best, little more than an aunt or uncle or a friendly visitor. Although Father claims the children cried at the end of the visits and wanted to return to his care, the record belies this contention. Rather, the record shows that the children repeatedly stated to the social worker and their attorney that they desired to stay with the maternal grandmother and be adopted by her. The children also reported that they believed their parents would never change; that they were happy and stable in their maternal grandmother's home; and that they did not want to return home to their parents. As to the youngest child, Roc.G., he had resided out of Father's care for half of his young life. Moreover, due to Roc.G.'s numerous medical needs, there is no indication in the record that Father was capable of handling his many serious medical needs. On the other hand, the record shows that the

---

[6] The record is unclear as to how long the maternal grandmother had been residing in the family home prior to the children's removal.

maternal grandmother was fully capable of tending to Roc.G.'s medical, emotional, and developmental needs.

Although Father had visited the children, had showed his commitment and love to the children, and the visits went well, the evidence regarding Father's visitation in no way showed that he occupied a parental role in the children's lives. Rather, Father's interactions with the children appeared to be more akin to a friendly visitor or non-parent relative, such as an uncle. It does not appear the children were particularly upset when the visitation sessions ended, or that they were particularly anxious to visit Father. Furthermore, although the children recognized Father would always be their biological father, it was not Father, but rather the maternal grandmother, that acted in a parental role for the children.

While there is some evidence supporting a finding of a positive relationship between Father and the children, there is also evidence supporting a reasonable conclusion that the children would gain a greater benefit from being placed in a permanent adoptive home. Father simply did not meet his burden to show that the bond between him and the children was so strong and beneficial to the children that it outweighed the benefit the children would receive from having a stable, adoptive home. As the record clearly shows, the children were bonded to their maternal grandmother and interacted with her as their parental figure. The children were doing very well in their maternal grandmother's home and were emotionally stable there. The children looked to

the maternal grandmother for comfort, love, and safety, and the maternal grandmother was committed to providing a permanent, stable home for the children.

We conclude that the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i), did not apply here.

III

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:


HOLLENHORST
J.


SLOUGH
J.

16